UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK ARNOLD BRUSSEAU,

     Plaintiff,                      Case No. 2:20-cv-12445

                                           District Judge Mark A. Goldsmith

v.                                    Magistrate Judge Kimberly G. Altman

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

     Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

I.     Introduction

This is a Social Security case.  Plaintiff Mark Arnold Brusseau

("Brusseau") brings this action under 42 U.S.C. § 405(g), challenging the final

decision of Defendant Commissioner of Social Security ("Commissioner")

denying his application for Disability Insurance Benefits ("DIB") under the Social

Security Act ("the Act").  Both parties have filed summary judgment motions

(ECF Nos. 15, 16), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, it is RECOMMENDED that the Commissioner's for Summary Judgment (ECF No. 16) be GRANTED, that Brusseau's Motion for Summary Judgment (ECF No. 15) be DENIED, and that the Commissioner's determination be AFFIRMED.

## II.   Background

### A.   Procedural History

Brusseau was 52 years old at the time of the January 26, 2015 alleged onset date.  (ECF No. 11-5, PageID.303).  He attended four or more years of college and worked previously as a shop worker, substitute teacher, and merchandizer.  (ECF No. 11-6, PageID.351).  He alleges disability due to health complications resulting from a heart attack, a steel plate in his neck, a lumbar spine condition, a right shoulder blade fracture, degenerative eye disease, dizzy spells, and an enlarged prostate.  (*Id.*, PageID.350).

After Brusseau's DIB application was denied at the initial level on September 29, 2015, he timely requested an administrative hearing, held April 26, 2017, in Lansing, Michigan before Administrative Law Judge ("ALJ") Colleen M. Mamelka.  (ECF No. 11-3, PageID.167).  On July 3, 2017, ALJ Mamelka found that Brusseau could perform his past relevant work as an elementary school

teacher, franchise sales representative, district advisor, fund raising director, and administrative assistant.  (*Id.*, PageID.167-177).  She found alternatively that Brusseau could perform a significant range of other work.  (*Id.*, PageID.177).

On January 3, 2019, the Appeals Council remanded the case for further hearing, noting that while the ALJ found that the conditions of syncope, urinary frequency, central serous chorioretinopathy,[1] and age-related macular degeneration caused significant work-related limitation, none of the conditions were reflected in the Residual Functional Capacity ("RFC").  (*Id.*, PageID.184). The Appeals Council also found that the ALJ erred by finding that Brusseau could perform his past relevant work as an elementary school teacher, franchise sales representative, district advisor, fundraising director, and administrative assistant, noting that Brusseau "did not perform these jobs long enough to learn them" or his earnings did not qualify as Substantial Gainful Activity ("SGA").  (*Id.*, PageID.184).  The ALJ was directed to "give further consideration to" Brusseau's

---

[1] Syncope "is another word for fainting or passing out.  Someone is considered to have syncope if they become unconscious and go limp, then soon recover."  https://www.hopkinsmedicine.org/health/conditions-and-diseases/ syncope-fainting.  (Last visited February 2, 2022).

Central serous chorioretinopathy "typically occurs in males in their 20s to 50s who exhibit acute or sub-acute central vision loss or distortion." https:/eyewiki.aao. org/Central_Serous_Chorioretinopathy.  (Last visited January 31, 2022).

maximum RFC and elicit further Vocational Expert ("VE") testimony.  (*Id.*, PageID.185).

ALJ Mamelka held a second hearing on July 16, 2019.  (ECF No. 11-2, PageID.78).  Brusseau, represented by non-attorney Bryan A. Christie, testified, as did a VE.  (*Id.*, PageID.90, 123, 130).

Brusseau offered the following testimony:

He lost his prior teaching position due to a "medical marijuana felony." (*Id.*, PageID.101).  He would be unable to perform any of his past relevant work due to syncope caused by arising from a squatting position.  (*Id.*, PageID.124). Being at an elevation of over 6,000 feet caused him to lose consciousness.  (*Id.*, PageID.124).  He drove as little as possible since having a heart attack.  (*Id.*, PageID.125).

Brusseau based his claim for disability on cervical radiculopathy, hypertension, high lipids, degenerative disc disease, GERD, arthritis of the back, syncope, urinary frequency, and eye problems.  (*Id.*, PageID.130).  Since his first heart attack in 2015, he had a heart attack "every 14 months."  (*Id.*, PageID.130-132).  He took his medications as prescribed and experienced the side effects of fatigue and forgetfulness.  (*Id.*, PageID.131).  He slept only four hours a night due to the condition of sleep apnea.  (*Id.*).  He attributed the need for rehearing to the fact that the ALJ had just begun her position on the day of his first hearing and

was "brand new." (*Id.*, PageID.132).  The medical examiner at his consultative examination was "taking phone calls talking to his brother-in-law" during the examination.  (*Id.*, PageID.134).

Brusseau had "no idea" how much weight he could lift or carry.  (*Id.*, PageID.133).  He was able to ride a stationary bike for up to eight miles as of September 2016.  (*Id.*, PageID.134).  In response to questioning about using a kayak in May 2017, he denied owning a kayak and stated that he did not know whether he could "get in and out of it now."  (*Id.*, PageID.135).  He admitted that he traveled to a family reunion in New Mexico since the alleged onset of disability but reiterated that he passed out while traveling as a car passenger in the mountains.  (*Id.*).  His blood pressure was stable but he experienced fatigue.  (*Id.*, PageID.136).  Lyrica, taken for right shoulder pain, caused forgetfulness.  (*Id.*). He experienced daily dull chest pain.  (*Id.*, PageID.137).  He took nitroglycerin at least three times a week.  (*Id.*).

In response to questioning by his representative, Brusseau reported that he experienced about 20 bad days a month which were characterized by severe shoulder pain.  (*Id.*, PageID.139).  On a good day, he enjoyed visiting with his son or granddaughter.  (*Id.*, PageID.140).  He relied on his girlfriend for most of his transportation.  (*Id.*).  He experienced depression which had been exacerbated by his mother's recent death.  (*Id.*, PageID.141).  Counseling sessions requiring him

to talk about himself made him more depressed.  (*Id.*, PageID.141).  He coped

with his depression by using marijuana.  (*Id.*, PageID.142).  He opined that his

depression prevented him from performing work as a telemarketer.  (*Id.*).

Brusseau closed his testimony by stating that his heart problems were

ongoing and also noting that his father and two brothers had died of heart attacks

before reaching his age.  (*Id.*, PageID.145).

On August 6, 2019, the ALJ determined that Brusseau was not disabled.

(*Id.*, PageID.62-72).  On July 6, 2020, the Appeals Council denied review of the

ALJ's findings, making the ALJ's decision the final decision of the

Commissioner.  (*Id.*, PageID.47).  Brusseau timely filed for judicial review of the

final decision on September 4, 2020.

### B.      Medical Evidence

On January 26, 2015, Brusseau underwent a cardiac catheterization with the

placement of cardiac stents.  (ECF No. 11-7, PageID.407).  Surgical records show

an unremarkable procedure.  (*Id.*, PageID.409-410, 414, 418).  Discharge records

from two days later note that Brusseau denied further symptoms.  (*Id.*,

PageID.422).  March 2015 records by Cardiologist Tareq Baghal, M.D. note that

Brusseau sought emergency treatment after having a fainting spell during an

outpatient cardiac rehabilitation class.  (*Id.*, PageID.424).  Dr. Baghal prescribed a

change of cardiac medication.  (*Id.*, PageID.427-428, 431).  Brusseau was advised to lose weight and follow a low fat, low sodium diet.  (*Id.*, PageID.442).

The following month, Brusseau reported moderate chest pain while at rest and syncope.  (*Id.*, PageID.451).  In May, 2015, he sought emergency treatment for chest pain.  (*Id.*, PageID.456).  Testing was negative for myocardial infarction or other heart-related conditions.  (*Id.*, PageID.458-470).

In July 2015, Brittany Williamson, D.O. noted Brusseau's report of right shoulder pain aggravated by movement and repetitive motion.  (*Id.*, PageID.555).  Brusseau described himself as "very active," reporting that he painted "as a hobby."  (*Id.*, PageID.557).  Imaging studies of the right showed only mild degenerative changes.  (*Id.*, PageID.560).

A September 2015 consultative examination by Mohammed Khaleel, D.O. contain findings of a normal gait and station; 5/5 muscle strength in all extremities; and a limited range of motion due to low back pain.  (*Id.*, PageID.564).  Brusseau did not display manipulative limitations.  (*Id.*).  Dr. Khaleel noted that a recent cervical spinal fusion was precipitated by a golf course injury.  (*Id.*, PageID.566).  Brusseau displayed a full range of shoulder motion.  (*Id.*).  Dr. Khaleel noted his allegations of blurred vision.  (*Id.*, PageID.568).

Later in September 2015, Alyce Metoyer, D.O. performed an non-examining physical assessment based on the treating and consultative records, finding that Brusseau could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation. (ECF No. 11-3, PageID.158). Dr. Metoyer limited to Brusseau to frequently ramp/stair climbing and occasional balancing, stooping, kneeling, crawling, and climbing of ladders/ropes/scaffolds. (*Id.*, PageID.159). She found that Brusseau should avoid concentrated exposure to wetness, vibration, and hazards. (*Id.*, PageID.159).

Dr. Baghal's March 2016 records note the absence of cardiac symptoms. (ECF No. 11-10, PageID.802). May 2016 imaging studies of the lumbosacral spine showed diffuse degenerative disc disease at L4-S1 and "minimal facet arthritis at L4-S1 (left) and L4-L5 (right). (*Id.*, PageID.765). The same month, Dr. Baghal noted the absence of edema. (*Id.*, PageID.770). A June 2016 x-ray of the right shoulder was unremarkable. (*Id.*, PageID.746). October 2016 physical therapy records state that Brusseau was able to ride a bike for 10 miles. (ECF No. 11-8, PageID.592). A November 2016 x-ray of the right shoulder showed mild degenerative changes with possible ligamentous laxity of the shoulder joint. (ECF No. 9, PageID.675). Dr. Baghal's records from the same month note the absence of edema or other symptoms. (*Id.*, PageID.677).

8

February 2017 records by orthopedist Iman Abou-Chakra, M.D. note Brusseau's report of continued neck and right shoulder, scapula and radiating hand pain. (ECF No. 11-9, PageID.625). Brusseau denied improvement from chiropractic visits or physical therapy. (*Id.*). The same month, Muhammod Abdullah, M.D. noted Brusseau's report of chronic lower back pain. (*Id.*, PageID.643). Dr. Baghal's February 2017 records note Brusseau's denial of cardiac symptoms and the absence of edema. (*Id.*, PageID.650). In May 2017, Brusseau sought emergency treatment for a poison ivy rash acquired while kayaking. (ECF No. 11-13, PageID.1156-1157). In September 2017, Brusseau underwent a left heart catheterization with stent placement after experiencing chest pain. (*Id.*, PageID.1083). Dr. Baghal's follow-up records note the absence of edema. (ECF No. 11-15, PageID.1301). November 2017 records note Brusseau's report of chest pain. (*Id.*, PageID.1307). A physical examination was unremarkable. (*Id.*). Dr. Baghal noted the ongoing condition of chronic stable angina with well-controlled hypertension. (*Id.*, PageID.1310).

In February 2018, Brusseau reported "mild to moderate angina." (*Id.*, PageID.1317). He reported dizziness but denied any loss of consciousness. (*Id.*, PageID.1318). July 2018 records were negative for edema. (*Id.*, PageID.1336). The following month, Brusseau reported ongoing right leg pain due to a February

2017 snowmobiling injury.  (ECF No. 11-14, PageID.1225) (ECF No. 11-13, PageID.1153).

A left heart catheterization performed in November 2018 showed normal left ventricular systolic function with heart function in the normal range and normal left ventricular and diastolic pressure.  (ECF No. 11-13. PageID.1139).  Brusseau was medically cleared for a prostate biopsy in February 2019.  (*Id.*, PageID.1350).

In July 2019, Dr. Baghal completed an assessment of Brusseau's work-related abilities, noting the condition of coronary artery disease causing angina even "with minimal activity."  (ECF No. 11-15, PageID.1358).  He gave Brusseau a "fair" prognosis.  (*Id.*).  He found that Brusseau's heart condition was exacerbated by anxiety.  (*Id.*, PageID.1359).  He found that Brusseau was unable to walk more than half a block; sit for 10 minutes at a time or stand for more than 20; or stand/walk for even two hours in an eight-hour workday.  (*Id.*).  He opined that Brusseau required a work break every two hours lasting for up to 20 minutes.  (*Id.*).  He noted that Brusseau experienced muscle weakness and chronic fatigue.  (*Id.*).

Dr. Baghal found further that Brusseau's legs needed to be elevated to hip level 60 percent of the workday due to leg edema.  (*Id.*, PageID.1360).  He found that Brusseau required the use of a cane for the syncope and weakness.  (*Id.*).  He

found that Brusseau could climb stairs occasionally and twist, stoop, or crouch rarely. (*Id.*). He precluded all climbing of ladders. (*Id.*). He found the bilateral manipulative limitations of grasping only 30 percent of the time; fingering, 20; reaching forward, 40; and reaching overhead, 10. (*Id.*). He found that Brusseau would typically be off task 25 percent or more of the day and would miss more than four days of work each month. (*Id.*, PageID.1361). He opined that Brusseau was incapable of even low stress work. (*Id.*).

III.   Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001); 20 C.F.R. § 404.1520. "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Brusseau was not disabled under the Act. At Step One, the ALJ found that Brusseau had not engaged in substantial gainful activity since the alleged onset date of January 26, 2015 through the date last insured for DIB of June 30, 2019. (ECF No. 11-2, PageID.64). At Step Two, the ALJ found that he had the severe impairments of "coronary artery disease (CAD) with history of anterolateral non-ST elevated

12

myocardial infarctions s/p percutaneous coronary intervention and stenting; hypertension; degenerative disc disease (DDD); cervical radiculopathy s/p fusion; degenerative joint disease (DJD); facet arthritis; dyslipidemia; GERD; and obesity." (*Id.*, PageID.64-65).   At Step Three, the ALJ found that Brusseau's impairments, whether considered alone or in combination did not meet or medically equal a listed impairment.  (*Id*., PageID.68).

The ALJ then assessed Brusseau's RFC, concluding that he was capable of performing light work with the following additional limitations:

> [F]requent rotation/flexion of the neck.  The claimant could occasionally balance, climb ramps/stairs, stoop, kneel, crouch and crawl. He could climb no ladders, ropes or scaffolds.  The claimant could not work around unprotected heights or dangerous moving machinery.

(*Id*., PageID.69).

Relying on the VE's testimony at Step Four, the ALJ found that Brusseau could perform his past relevant work as a fundraiser as the work was actually performed at the sedentary level and as generally performed in the national economy at the light exertional level.  (*Id*., PageID.72, 125).

## IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although the court can

examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one. Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision. *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017)(same).

An ALJ's factual findings must be supported by "substantial evidence." 42 U.S.C. § 405(g). The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does

14

not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651 (internal quotations omitted).

V.      Analysis

A.      The ALJ's Treating Physician Analysis

In support of his argument for a remand for further fact-finding, Brusseau

argues that the ALJ erred by according only "little weight" to treating physician

Dr. Baghal's July 2019 assessment.  (ECF No. 15, PageID.1378) citing (ECF No.

11-2, PageID.71;ECF No. 11-15, PageID.1359-1361).  The Commissioner argues

to the contrary that the ALJ's accord of little weight to Dr. Baghal's assessment

was adequately explained and generously supported by the record.  (ECF No. 16,

PageID.1409-1411).

Brusseau applied for DIB on March 2, 2015.  (ECF No. 11-5, PageID.302).

For claims filed before March 27, 2017, the opinion of a treating physician is

accorded controlling weight if "well-supported by medically acceptable clinical

and laboratory diagnostic techniques," and "not inconsistent with the other

substantial evidence."  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th

Cir. 2004); 20 C.F.R. § 404.1527(c)(2).[2]  In the presence of contradicting

substantial evidence however, the ALJ may reject all or a portion of the treating

---

[2] In contrast, for claims made on or after March 27, 2017, the ALJ will weigh
both treating and non-treating medical evaluations based on how well they are
supported by the remainder of the record. 20 C.F.R. § 404.1520c.  ("We will not
defer or give any specific evidentiary weight, including controlling weight, to any
medical opinion(s) or prior administrative medical finding(s), including those from
your medical sources").

source's findings, *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; § 404.1527(c). In declining to give less than controlling weight to the treating physician's opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) the "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544. "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide good reasons for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion. *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785, (6th Cir. 2017), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (internal quotations omitted).

As discussed in Section II above, Dr. Baghal found that as a result of coronary artery disease causing angina even "with minimal activity," Brusseau was unable to walk more than half a block; sit for 10 minutes at a time or stand for more than 20; or stand/walk for even two hours in an eight-hour workday. (ECF No. 11-15, PageID.1358-1359). Dr. Baghal opined further that Brusseau required a work break every two hours lasting for up to 20 minutes and that his legs needed to be elevated to hip level 60 percent of the workday due to leg edema. (*Id.*, PageID.1359-1360). He found that Brusseau required the use of a cane for the

syncope and weakness.  (*Id.*, PageID.1360).  He found that Brusseau could climb

stairs occasionally and twist, stoop, or crouch rarely.  (*Id.*).  He precluded all

climbing of ladders.  (*Id.*).  He found bilateral manipulative limitations in

grasping, fingering, reaching forward, and reaching overhead.  (*Id.*).  He found

that Brusseau would typically be off task 25 percent or more of the day and would

miss more than four days of work each month.  (*Id.*, PageID.1361).  He opined

that Brusseau was incapable of even low stress work.  (*Id.*).

     Contrary to Brusseau's contention, the ALJ provided good reasons for

rejecting Dr. Baghal's assessment.  Before according "little weight" to the

assessment, the ALJ acknowledged Dr. Baghal's status as a long-term, treating

cardiologist.  (ECF No. 11-2, PageID.71).  She continued:

> In July 2019, Dr. Baghal gave the claimant work preclusive limitations,
> which included elevating his legs 60% of the time due to leg edema and
> missing more than four days of work per month (Exhibit 37F).  I give
> this opinion little weight as it is inconsistent and not supported by his
> treatment notes that continually document unremarkable physical
> examinations through June of 2019, specifically noting mild or no
> bilateral edema.  (Exhibits 19F, 28F and 36F).

The ALJ's observation that the treating records, particularly, Dr. Baghal's own

records, showed minimal or no edema is supported by the undersigned's review of

the record.  (ECF No. 11-9, PageID.650, 677;ECF No. 11-10, PageID.770).

While Brusseau contends that the lack of support for Dr. Baghal's "edema"

finding is not sufficient to reject the entire treating assessment (ECF No. 15,

PageID.1381), the ALJ's analysis of the treating records did not end there.  She

correctly noted that Dr. Baghal's "unremarkable" examination records, found at

Exhibits 19F, 28F, and 36F, also support the non-disability finding.  (*Id.*) (ECF

No. 11-15, PageID.1293-1294, 1345-1353).  *See Cosma v. Comm'r of Soc. Sec.*,

652 F. App'x 310, 311(6th Cir. 2016) (affirming finding that treating physician's

"conclusion that Cosma is unable to work directly conflicted with the objective

medical evidence in the record, including [physician's] own treatment notes,

which generally showed that Cosma did not have disabling functional

impairments.").  The ALJ also found that the rejection of Dr. Baghal's assessment

was also supported by "radiographic evidence," evidence of only "mild to

moderate pathology," the clinical cardiac examinations, a normal gait and station,

and well-controlled hypertension.  (ECF No. 11-2, PageID.71).  *See Gaskin v.*

*Comm'r of Soc. Sec.*, 280 F. App'x 472, 475, 2008 WL 2229848, at *3 (6th Cir.

2008) (treating physician's opinion permissibly rejected where contradicted by

clinical and objective studies).

        Although the ALJ's treating physician "analysis" adequately articulated her

reasons for rejecting Dr. Baghal's assessment, the ALJ provided additional

reasons for its rejection elsewhere in her determination.  She acknowledged

Brusseau' history of cardiac disease and stent placement in January 2015 and

September 2017 but cited Dr. Baghal's follow-up examinations showing that the

treatment was effective. (*Id.*, PageID.70). *See also* (ECF No. 11-10, PageID.798, 805, 811;ECF No. 11-15, PageID.1293-1294, 1345-1353). Contrary to Dr. Baghal's finding that Brusseau was incapable of even sedentary work, the ALJ noted that Brusseau could ride a bike for eight to ten miles, snowmobile, and kayak during the relevant period. (ECF No. 11-2, PageID.70).

　　Brusseau also contends that Dr. Baghal's discrete findings that he would require more than four absences each month and that he required excessive workday breaks were not addressed by the ALJ. (ECF No. 15, PageID.1381). To be sure, the VE testified that Brusseau's alleged need to be absent from work more than four days a month, with nothing more, would preclude all gainful employment. (*Id.*, PageID.127). However, substantial evidence cited by the ALJ supports the rejection of Dr. Baghal's finding of the need for excessive breaks and absences. The ALJ accorded "great weight" to Dr. Metoyer's September 2015 finding that Brusseau was capable of performing a significant range of exertionally light work on a full-time basis.[3] (*Id.*, PageID.71;ECF No. 11-3,

---

[3]Although Brusseau does not raise the issue, the undersigned is mindful that Dr. Metoyer's assessment predates Dr. Baghal's by almost four years. *See Brooks v. Commissioner of Social Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013) (ALJ adoption of non-examining source's earlier opinion over the more recent examining findings can constitute grounds for remand). However, the adoption of older records over newer ones does not automatically constitute error. An ALJ is not barred from according greater weight to the older records provided that she give some indication that she considered the more recent evidence. Courts "require 'some indication that the ALJ at least considered these new facts before

PageID.158-159). *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 853 (6th Cir. 2020) (non-treating finding by an acceptable medical source that claimant was not disabled adequately supports the finding that he could perform "sustained work").

Because the ALJ's rejection of Dr. Baghal's assessment is adequately articulated and supported by Dr. Baghal's own treating records, the radiographic studies, Brusseau's activities, and the opinion of another acceptable medical source, a remand on the basis of the ALJ's treating physician analysis is not warranted.

### B.     The RFC

Building on his first argument, Brusseau contends that the RFC for light work does not reflect Dr. Baghal's treating assessment. (ECF No. 15, PageID.1382). He also argues that contrary to the requirements of Program Operations Manual System ("POMS"), DI 24510.005(c)(2) and DI 24510.057, the ALJ failed to consider the effect of "stamina" and "endurance" in crafting the

---

giving greater weight to an opinion that is not based on a review of a complete case record.' " *Brooks*, at 642 (*citing Blakley v. Commissioner of Social Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)) (ALJ's failure to show that she considered the later evidence supports a remand to address the more recent records) (internal citations omitted). Here, the ALJ's thorough discussion of the records between September 2015 forward provides the required "indication" that she considered the more recent evidence. (ECF No. 11-2, PageID.66, 70-71). Moreover, the ALJ noted that the RFC reflected a greater degree of postural and environmental limitation than found in Dr. Metoyer's assessment by limiting Brusseau to frequent (rather than constant) rotation/flexion of the neck and a preclusion on (rather than occasional) use of ropes, ladders, and scaffolds. (*Id.*, PageID.71).

RFC.  (*Id.*, PageID.1383).  In turn, the Commissioner argues that substantial

evidence generously supports the RFC for a limited range of exertionally light

work.  (ECF No. 1416-1417, PageID.16).  The Commissioner also notes that

POMS, an internal agency manual, "'is not a regulation . . . and has no legal force.

. . .'" (*Id.*, PageID.1417) (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981))

(per curiam).

      An RFC describes an individual's residual abilities.  *Howard v. Comm'r of

Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).  The "RFC is to be an 'assessment of

[a claimant's] remaining capacity for work' once [his] limitations have been taken

into account." *Id.*  In determining a claimant's RFC, it is necessary to consider (1)

objective medical evidence as well as (2) subjective evidence of pain or disability.

§ 404.1545(a)(1) (RFC must be based on all "relevant evidence").  In crafting the

RFC, the ALJ must consider the alleged physical, mental, and environmental

restrictions.  § 404.1545(b-d);  SSR 96-8p, 1996 WL 374184, at *6 (June 2,

1996).  An ALJ is permitted to draw from multiple medical sources in whole or

part in crafting the RFC.  *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728

(6th Cir. 2013); SSR 96-8p at *2.

      As discussed above, because substantial evidence supports the rejection of

Dr. Baghal's assessment, the ALJ was not required to incorporate those findings

into the RFC. *See Stanley v. Sec'y of Health and Human Servs*, 39 F.3d 115, 118–

119 (6th Cir. 1994) (ALJ not obliged to credit rejected claims in question to VE or by extension, in the ultimate RFC).  Further, the RFC for a reduced range of light work, amply supported by the record, was well explained by the ALJ.  She recounted Brusseau's allegations of limitation but noted that his professed degree of impairment was unsupported by the record.  (ECF No. 11-2, PageID.69).  She cited the treating records following the January 2015 and September 2017 stent placement showing relatively normal cardiac examinations.  (*Id.*).  She noted that an April 2016 stress test was negative.  (*Id.*).  She observed that an x-ray of the cervical spine showed only mild osteoarthritis.  (*Id.*).  However, based on Brusseau's history of cervical fusion, she limited him to frequent rather than constant rotation/flexion of the neck.  (*Id.*, PageID.71).

The ALJ also provided a fulsome discussion of the impairments that she found non-severe, noting that the treating records showed that Brusseau experienced only one actual episode of syncope (fainting) in March 2015 "without further recurrence."  (*Id.*, PageID.66).  She noted that the condition of urinary frequency was controlled with medication.  (*Id.*).  She observed that while Brusseau was diagnosed with age-related macular degeneration, ophthalmologic records did not show the loss of visual acuity or fields.  (*Id.*).  She found that Brusseau's allegations of a right shoulder fracture were contradicted by the

imaging studies showing no acute fracture and the records showing a full range of motion.  (*Id.*, PageID.68).

Brusseau's argument that the ALJ erred by failing to consider his stamina and endurance as required by POMS fails for several reasons. First, "POMS is a policy and procedure manual  . . . use[d] in evaluating Social Security claims [by the SSA] and does not have the force and effect of law. . . ."  *Davis v. Sec'y of Health & Hum. Servs.*, 867 F.2d 336, 340 (6th Cir. 1989).  The ALJ's failure to follow POMS, with nothing more, does not provide grounds for remand.

Second, POMS DI 24510.057 (Sustainability and the Residual Functional Capacity Assessment) states that "[o]rdinarily, RFC is the individual's maximum remaining ability to do **sustained** work activities[.]"  (boldface in original). "However, *if* a claimant is unable to sustain a 40-hour workweek because of a severe medically determinable impairment [] the adjudicator or medical consultant must discuss sustainability in the RFC."  *Id.* (emphasis added).  The problem with Brusseau's argument is that the ALJ did not find that he was unable to sustain a 40-hour workweek and, as discussed in this section and above, substantial evidence generously supports the finding that he perform full-time work. Therefore, the ALJ was not required provide a separate discussion of "sustainability."

Third, Dr. Metoyer's finding that Brusseau could perform the exertional requirements of light work (the ability to both sit for six hours a day or stand/walk for six in some combination thereof amounting to an eight-hour day) constitutes substantial evidence in support of the finding that Brusseau had the stamina and endurance for full-time work.  (ECF No. 11-3, PageID.158-159).  *See Emard, supra,* 953 F.3d at 853.  Fourth, the ALJ explicitly stated that the RFC reflected Brusseau's ability to "to do physical and mental work activities on a sustained basis despite limitations from his impairments." (ECF No. 11-2, PageID.64).

Because the RFC was well articulated and generously supported by the record, a remand on this basis is not warranted.

## C.    In Sum

The record shows that Brusseau clearly experiences an ongoing cardiac condition requiring monitoring, prescription medication, and recommended lifestyle changes.  However substantial evidence shows that Brusseau was able to obtain efficacious treatment for the condition and engage in a variety of activities supporting the finding that he could perform exertionally light work.  Because the ALJ's determination was within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court.  *Blakley, supra,* 581 F.3d at 406.

IV.    Conclusion

For the reasons set forth above, it is RECOMMENDED that the

Commissioner's for Summary Judgment (ECF No. 16) be GRANTED, that

Brusseau's Motion for Summary Judgment (ECF No. 15) be DENIED, and that

the Commissioner's determination be AFFIRMED.


Dated:  February 2, 2022                      s/Kimberly G. Altman
Detroit, Michigan                             KIMBERLY G. ALTMAN
                                              United States Magistrate Judge

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &

Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise

some issues but fail to raise others with specificity will not preserve all the

objections a party might have to this Report and Recommendation.  *Willis v. Sec'y

of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit

Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local

Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 2, 2022.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager